**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**GREGORY A. WHITE,**

                                        **Petitioner,**

                v.                                                          **9:07-CV-1175**
                                                                              **(FJS/GHL)**

**JAMES CONWAY, Superintendent,**
**Attica Correctional Facility,**

                                        **Respondent.**
_____

**APPEARANCES**                                    **OF COUNSEL**

**THE OFFICE OF DONALD M.**                  **DONALD M. THOMPSON, ESQ.**
**THOMPSON, PC**
The Powers Building
16 West Main Street, Suite 243
Rochester, New York 14614
Attorneys for Petitioner

**OFFICE OF NEW YORK STATE**                **THOMAS B. LITSKY, AAG**
**ATTORNEY GENERAL**
120 Broadway
New York, New York 10271
Attorneys for Respondent

**SCULLIN, Senior Judge**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

On September 21, 2007, Petitioner commenced this proceeding pursuant to 28 U.S.C.

§ 2254, claiming that Petitioner's conviction was the product of various constitutional violations.

In his petition, Petitioner set forth numerous grounds for relief, including challenges to certain

evidentiary rulings, the sufficiency of the evidence against him, and the propriety of the sentence

that the trial court imposed.  *See* Dkt. No. 1.  Respondent challenged the petition as untimely, as well as on the merits.  *See* Dkt. No. 12.

In a Report-Recommendation & Order dated January 18, 2011, Magistrate Judge Lowe recommended that the Court dismiss the petition as untimely because Petitioner filed it one-day late and because Petitioner offered no basis to excuse his late filing.  *See* Dkt. No. 17.

Currently before the Court are Petitioner's objections to the January 18, 2011 Report-Recommendation & Order.  *See* Dkt. No. 18-19.


## II. BACKGROUND[1]

In 1995, Petitioner lived in Chittenango, New York, with his wife AW and his stepchildren JD, SD, and JS.[2]  In 1999, Petitioner was charged in a six-count indictment with having committed various sexual acts in "the latter part of 1995" with his then-ten and thirteen-year-old stepdaughters.  The indictment alleged that Petitioner forced both victims to engage in oral sexual conduct and had sexual intercourse with the thirteen-year-old victim, all while playing his version of a game of "Truth or Dare" in his home.

Following an investigation, Petitioner was arrested on August 13, 1998.  After being given his *Miranda* warnings, Petitioner admitted to playing "Truth or Dare" with the children while they were naked.  Moreover, he admitted that, during the game, JD performed a sexual act for him.

---

[1] Unless otherwise noted, the Court has adopted the "Background" facts from the January 18, 2011 Report-Recommendation & Order.  *See* Dkt. No. 17.

[2] In accordance with New York Civil Rights Law § 50-b, the Court has abbreviated the surnames of the alleged victims and their family members.

Following a jury trial in Madison County Court, the jury found Petitioner guilty of the charges. The trial court subsequently sentenced him on the most serious charges to two consecutive prison terms of 12-1/2 to 25 years. On March 16, 2006, the Appellate Division, Third Department, affirmed Petitioner's convictions, *see People v. White*, 27 A.D.3d 884 (3d Dep't 2006); and, on June 22, 2006, the New York State Court of Appeals denied leave to appeal, *see People v. White*, 7 N.Y.3d 764 (2006).

On September 21, 2007, Petitioner's counsel filed this petition on Petitioner's behalf. In his petition, Petitioner alleged that the trial court erred (1) by denying his motion for suppression of statements; (2) by denying his motion to dismiss the indictment; (3) by denying his speedy trial motion; (4) by unduly restricting cross-examination of prosecution witnesses; (5) by precluding him from presenting witness testimony; (6) by refusing to instruct the jury pursuant to New York Criminal Procedure Law § 710.70; and (7) by refusing to instruct the jury as to "prompt outcry." Petitioner also alleged that (1) the jury's verdict was not supported by legally sufficient evidence and was against the weight of the evidence; (2) the cumulative effect of all errors denied him a fair trial; and (3) the sentence imposed was harsh and excessive.

In his January 18, 2011 Report-Recommendation & Order, Magistrate Judge Lowe found the petition untimely and, therefore, did not address the merits of Petitioner's arguments. *See* Dkt. No. 17 at 1-2. Specifically, the court found that "Petitioner's conviction became final ninety days after the June 22, 2006 denial of his application for leave to appeal, or on September 20, 2006." *See id.* at 4. As such, the court found that the petition, which was filed on September 21, 2007, was one-day late and, therefore, untimely. *See id.*

Moreover, Magistrate Judge Lowe found unpersuasive Petitioner's arguments that the

-3-

mailbox rule should apply even though he was represented by counsel.  *See id.* at 5.  Magistrate

Judge Lowe also determined that Petitioner presented no exceptional circumstances to warrant

equitable tolling.  *See id.* at 6-8.  Magistrate Judge Lowe noted that the fact that the petition was

filed only one-day late and that the late filing was because of an "unusual delay" in the mail did

not constitute the "exceptional circumstances" necessary to warrant equitable tolling.  *See id.*

Finally, Magistrate Judge Lowe held that Petitioner failed to come forward with any new

evidence to support a claim of actual innocence and recommended that the Court decline to issue

a certificate of appealability.  *See id.* at 8-9.


### III. DISCUSSION

**A.       Timeliness of the petition**

### 1. Standard of review

When a party makes specific objections to a magistrate judge's recommendations, the

district court engages in *de novo* review of the issues raised in the objections.  *See Farid v.*

*Bouey*, 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008) (citation omitted).  When a party fails to make

specific objections, however, the court reviews the magistrate judge's recommendations for clear

error.  *See id.* at 306 (citation omitted); *see also Gamble v. Barnhart*, No. 02CV1126, 2004 WL

2725126, *1 (S.D.N.Y. Nov. 29, 2004) (citations omitted).


### 2. Mailbox rule

Petitioner asserts that Magistrate Judge Lowe improperly concluded that, because he is

represented by counsel, the mailbox rule is inapplicable.  *See* Dkt. No. 18 at 4.[3]  Petitioner argues

that, had he mailed the petition to the Court instead of to his counsel, the Court would have

considered the petition filed as of September 14, 2007 – the date he gave the petition to prison

officials to mail.  *See id.*

    Under the prison-mailbox rule, the court deems a *pro se* prisoner's complaint filed on the

date that the prisoner delivered the complaint to prison officials for transmittal to the court.  *See*

*Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993) (citing *Houston v. Lack*, 487 U.S. 266, 270, 108

S. Ct. 2379, 2382, 101 L. Ed. 2d 245 (1988)).  "This 'prison mailbox' rule is justified by the

litigant's dependence on the prison mail system and **lack of counsel** to assure timely filing with

the court."  *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001) (citation omitted) (emphasis added).

    As Magistrate Judge Lowe correctly held, the prison mailbox rule is inapplicable to the

present matter because Petitioner was represented by counsel.  *See* Dkt. No. 17 at 5 (citations

omitted).  Petitioner has presented no justification for extending this rule to petitioners who are

represented by counsel.  *See Brockway v. Burge*, 710 F. Supp. 2d 314, 322 (W.D.N.Y. 2010)

(holding that, because the petitioner "was proceeding with the assistance of counsel with regard

to the preparation and filing of his habeas Petition, . . . [the] prisoner mailbox rule is inapplicable

---

[3] In the first set of objections that Petitioner filed, Petitioner argued that Magistrate Judge
Lowe improperly concluded that, because he was represented by counsel, the "'prison mailbox
rule'" did not apply.  *See* Dkt. No. 18 at 3.  Specifically, Petitioner argued that "[t]he Magistrate's
recommendation in this case presupposes the existence of an attorney-client relationship that
sufficiently predated the filing deadline to allow for the timely drafting and filing of the petition,
concomitantly inferring that the failure to timely file was avoidable, and therefore negligent[.]"
*See id.*  Thereafter, Petitioner asserts that the record is bereft of facts that establish the length of
the attorney-client relationship but then fails to set forth any information that would lead the
Court to believe that this relationship was of such a short duration so as to justify the application
of the mailbox rule to this action despite the fact that Petitioner is represented by counsel.

(citations omitted)).

Accordingly, the Court affirms Magistrate Judge Lowe's conclusion that the prison mailbox rule does not apply to the present matter.

### 3. Statute of limitations

Section 2254 of Title 28 of the United States Code, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs federal habeas corpus review of a state-court conviction. Since Petitioner filed his petition after the AEDPA was enacted, the petition is subject to a one-year statute of limitations that runs from the latest of the following four events:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)-(D).

For Petitioner, like most habeas petitioners, section 2244(d)(1)(A) sets the applicable starting point for the one-year statute of limitations – that is, "the date on which the judgment

became final by the conclusion of direct review or the expiration of the time for seeking such review[.]"  28 U.S.C. § 2244(d)(1)(A).

Rule 6(a) of the Federal Rules of Civil Procedure governs the method for computing time periods, including the application of controlling statutes of limitations, in actions pending in federal court.  *See United States v. Hurst*, 322 F.3d 1256, 1260 (10th Cir. 2003) (quotation omitted); *see also Day v. Morgenthau*, 909 F.2d 75, 78 (2d Cir. 1990) (quotation omitted).[4]  Rule 6(a)(1) directs that when applying a prescribed time, "exclude the date of the event that triggers the period[,]" but include the last day unless it falls on a Saturday, Sunday, a legal holiday, or a day on which weather or other conditions make the clerk's office inaccessible.  *See* Fed. R. Civ. P. 6(a)(1) and (3).[5]  "Under [Rule 6(a)(1)], when a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the relevant act.  The anniversary date is the 'last day to file even when the intervening period includes the extra leap year day.'"  *Hurst*, 322 F.3d at 1260 (quoting [*United States v.*] *Marcello*, 212 F.3d [1005,] 1010 [(7th Cir. 2000)]); *see also Day*, 909 F.2d at 79 (quotation and other citation omitted).

---

[4] By their own terms, the Federal Rules of Civil Procedure apply to habeas cases.  *See* Fed. R. Civ. P. 81(a)(4) (stating that "[t]hese rules apply to proceedings for habeas corpus . . . to the extent that the practice in those proceedings: (A) is not specified in a federal statute, the Rules Governing Section 2254 Cases . . . and  (B) has previously conformed to the practice in civil actions").  In addition, Rule 12 of the Rules Governing Section 2254 cases in the United States District Courts provides that "[t]he Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."  Rule 12 of the Rules Governing Section 2254 Cases in the United States District Courts.

[5] To illustrate the point, assume that a claim bearing a two-week statute of limitations accrued on a Monday.  By operation of Rule 6(a)(1), the Monday of accrual would be excluded as the day that triggers the event and then every day after that Monday would be counted, including the last day of the fourteen-day limitations period, in this case the second Monday.

In the present matter, the New York Court of Appeals denied Petitioner's application for leave to appeal on June 22, 2006. *See People v. White*, 7 N.Y.3d 764 (2006); *see also* Dkt. No. 1 at 2. Since Petitioner did not file a petition for a *writ of certiorari* with the United States Supreme Court, his conviction became final on Wednesday, September 20, 2006, *i.e.*, ninety (90) days after the Court of Appeals denied him leave to appeal, which is the date his time to file a petition seeking a *writ of certiorari* from the Supreme Court expired. *See Williams v. Artuz*, 237 F.3d 147, 151 (2d Cir. 2001) (citations omitted).

Petitioner does not contend that Magistrate Judge Lowe improperly determined the date that his conviction became final; rather, he contends that Magistrate Judge Lowe should have equitably tolled the statute of limitations because he filed his petition only one-day late, and that this late filing was a result of confusion stemming from language in several cases providing that the statute did not begin to run until the day after the conviction became final.

In *Day v. Morgenthau*, 909 F.2d 75 (2d Cir. 1990), albeit in the civil rights context, the Second Circuit held that, even though the day that the action accrues is not counted pursuant to Rule 6(a) of the Federal Rules of Civil Procedure, "'[w]hen the applicable limitations period is measured in years, . . . the anniversary date [**of the date of accrual is**] the last day for instituting action.'" *Id.* at 79 (holding that Rule 6(a) should have the same result as New York General Construction Law § 20, which also provides that the first day to be counted is the day after the date of accrual (quotation and other citation omitted)) (emphasis added). As such, the Second Circuit held that the action, filed on December 13, 1988, alleging an unlawful arrest and search that occurred on December 12, 1985, was one-day late and dismissed the complaint. *See id.*; *see also Ross v. Artuz*, 150 F.3d 97, 103 (2d Cir. 1998) (applying *Day* and Rule 6(a) of the Federal

Rules of Civil Procedure in the context of a petition brought pursuant to 28 U.S.C. § 2254 (citations omitted)).

Here, Petitioner's date of accrual was September 20, 2006; and, therefore, pursuant to Rule 6 of the Federal Rules of Civil Procedure, Petitioner had until September 20, 2007 (the anniversary of the date of accrual) to file his petition. Accordingly, the Court finds that Magistrate Judge Lowe correctly determined that Petitioner filed his petition one-day late.

### 4. Equitable tolling

Petitioner asserts that Magistrate Judge Lowe should have equitably tolled the statute of limitations because he filed his petition only one-day late and because of "the unsettled status of the law relative to the calculation of the applicable filing period." *See* Dkt. No. 19 at 3. Moreover, Petitioner contends that Magistrate Judge Lowe should have granted him a certificate of appealability on the issue of whether the statute of limitations should be equitably tolled where a petition is filed one-day late because of miscalculation of the relevant filing period – "an issue that is currently pending before the Second Circuit in *Dillon v. Conway* . . . following the Second Circuit's order dated February 10, 2010 granting petitioner's motion for a certificate of appealability on this ground." *See id.*

Since courts have construed the AEDPA's one-year period as a statute of limitations rather than a jurisdictional bar, courts may equitably toll the period. *See Smith v. McGinnis*, 208 F.3d 13, 17 (2d Cir. 2000) (citations omitted). However, "[e]quitable tolling applies only in the 'rare and exceptional circumstance[ ].'" *Id.* (quotation omitted).

"In order to equitably toll the one-year period of limitations, [the petitioner] must show

that extraordinary circumstances prevented him from filing his petition on time." *Id.* (citation omitted).  "In addition, the party seeking equitable tolling must have acted with reasonable diligence throughout the period he seeks to toll." *Id.* (citation omitted).  Moreover, the petitioner must "demonstrate a causal relationship between the extraordinary circumstances on which the claim for equitable tolling rests and the lateness of his filing, a demonstration that cannot be made if the petitioner, acting with reasonable diligence, could have filed on time notwithstanding the extraordinary circumstances." *Valverde v. Stinson*, 224 F.3d 129, 134 (2d Cir. 2000) (citations omitted).

In general, the difficulties attendant to prison life, such as "transfers between prison facilities, solitary confinement, lockdowns, restricted access to the law library, and an inability to secure court documents do not by themselves qualify as extraordinary circumstances." *Amante v. Walker*, 268 F. Supp. 2d 154, 158 (E.D.N.Y. 2003) (citation omitted).  Moreover, simple ignorance of the applicable rules does not excuse a petitioner's failure to file a timely petition. *See Plowden v. Romine*, 78 F. Supp. 2d 115, 120 (E.D.N.Y. 1999).

In the present matter, Petitioner contends that his counsel mailed him the petition for his signature, by overnight mail, on September 12, 2007.  *See* Dkt. No. 16 at 27.  Petitioner signed the petition "and [it was] taken from him for mailing by prison officials on the morning of September 14, 200[7]."[6]  *See id.*  The petition, however, did not arrive in counsel's office until September 21, 2007, and counsel filed it that same day.  *See id.*  Petitioner claims that such an "unanticipated, uncharacteristic, virtually unprecedented, and substantially longer than the

---

[6] Petitioner repeatedly refers to September 2008, rather than September 2007, in his memorandum of law.  Magistrate Judge Lowe assumed that this was a typographical error.

normal and customary one-day mailing period for similar papers mailed from Attica Correctional

Facility" warrants the application of equitable tolling. *See id.*

Magistrate Judge Lowe concluded "that an alleged one-week lapse in time between the

date that Petitioner signed the petition and the date that counsel received the petition is [not] an

extraordinary circumstance warranting tolling." *See* Dkt. No. 17 at 7. Further, Magistrate Judge

Lowe noted that, even if this were an unusual delay beyond Petitioner's control, Petitioner's

counsel could have avoided this problem by mailing the petition earlier or by personally bringing

it to Petitioner for his signature. *See id.* (citing *Sandvik v. United States*, 177 F.3d 1269, 1272

(11th Cir. 1999) (holding that, "[w]hile the inefficiencies of the United States Postal Service may

be a circumstances beyond [the petitioner's] control, the problem was one that [petitioner's]

counsel could have avoided by mailing the [28 U.S.C. § 2255] motion earlier or by using a

private delivery service or even a private courier")).

Similarly, the fact that Petitioner filed only one day late does not warrant the application

of equitable tolling. *See Richard v. Rock*, No. 9:08-CV-145, 2009 WL 383762, *7 (N.D.N.Y.

Feb. 10, 2009) (holding that "the fact that the filing was only one day late is not itself a basis for

equitable tolling" (citations omitted)); *United States v. Locke*, 471 U.S. 84, 101 (1985) (holding

that, "[i]f 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so

on in a cascade of exceptions that would engulf the rule erected by the filing deadline").

Moreover, the Second Circuit has held that "attorney error *normally* will not constitute the

extraordinary circumstances required to toll the AEDPA limitations period[.]" *Baldayaque v.*

*United States*, 338 F.3d 145, 152 (2d Cir. 2003).[7]

Based on the foregoing, the Court finds that Petitioner failed to present extraordinary

circumstances justifying the untimely filing of his petition and adopts Magistrate Judge Lowe's

recommendation in this regard.

**B.      Merits of the petition**[8]

*1. Standard of review*

The enactment of the AEDPA brought about significant new limitations on the power of a

federal court to grant habeas relief to a state prisoner under 28 U.S.C. § 2254.  In discussing this

deferential standard, the Second Circuit noted in *Rodriguez v. Miller*, 439 F.3d 68 (2d Cir. 2006),

*cert. granted, judgment vacated and case remanded on other grounds by* 549 U.S. 1163 (2007),

that

> a federal court may award habeas corpus relief with respect to a
> claim adjudicated on the merits in state court only if the
> adjudication resulted in an outcome that: (1) was "contrary to, or
> involved an unreasonable application of, clearly established
> Federal law, as determined by the Supreme Court of the United
> States"; or (2) was "based on an unreasonable determination of the

---

[7] In *Baldayaque*, the Second Circuit acknowledged that "at some point, an attorney's behavior may be so outrageous or so incompetent as to render it extraordinary." *Baldayaque*, 338 F.3d at 152.  The court also noted, however, that "simple mistakes about the rules applied to the deadlines for filing of habeas petitions . . . are ordinary," *id.*, and do not meet the "extraordinary" level required to apply equitable tolling.

[8] Although the Court finds that the petition is untimely, because of the confusion over the proper calculation of the one-year statute of limitations and because the Second Circuit has granted a certificate of appealability in *Dillon* to determine whether the petitioner in that matter was entitled to equitable tolling in a similar situation, the Court will also address the merits of the petition.  *See Stevens v. United States*, Nos. 09 Civ. 4098, 03 Cr. 669, 2010 WL 3447900, *2 (S.D.N.Y. Sept. 1, 2010) (considering untimely petition on the merits).

> facts in light of the evidence presented in the State court
> proceeding."

*Id.* at 73 (quoting 28 U.S.C. § 2254(d)) (footnote omitted); *see also DeBerry v. Portuondo*, 403
F.3d 57, 66 (2d Cir. 2005) (quotation omitted); *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.
2003) (quotation omitted).

In providing guidance concerning the application of this test, the Second Circuit has
observed that

> a state court's decision is "contrary to" clearly established federal
> law if it contradicts Supreme Court precedent on the application of
> a legal rule, or addresses a set of facts "materially
> indistinguishable" from a Supreme Court decision but nevertheless
> comes to a different conclusion than the Court did. [*Williams v.
> Taylor*, 529 U.S. 362] at 405-06, 120 S. Ct. 1495 [(2000)]; *Loliscio
> v. Goord*, 263 F.3d 178, 184 (2d Cir. 2001) . . . . [A] state court's
> decision is an "unreasonable application of" clearly established
> federal law if the state court "identifies the correct governing legal
> principle from [the Supreme] Court's decisions but unreasonably
> applies that principle to the facts" of the case before it. *Williams*,
> 529 U.S. at 413, 120 S. Ct. 1495.

*Thibodeau v. Portuondo*, 486 F.3d 61, 65 (2d Cir. 2007); *see also Williams v. Artuz*, 237 F.3d
147, 152 (2d Cir. 2001) (citing *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)).

Significantly, a federal court engaged in habeas review is not charged with determining
whether the state court's determination was merely incorrect or erroneous, but instead whether
such determination was "objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409
(2000); *see also Sellan v. Kuhlman*, 261 F.3d 303, 315 (2d Cir. 2001) (citation omitted). Courts
have interpreted "objectively unreasonable" in this context to mean that "'some increment of
incorrectness beyond error'" is required for the habeas court to grant the application. *Earley v.
Murray*, 451 F.3d 71, 74 (2d Cir. 2006) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.

2000)).

A state court determines a petitioner's federal claim "on the merits" and triggers the

highly-deferential AEDPA standard of review when the state court "(1) disposes of the claim 'on

the merits,' and (2) reduces its disposition to judgment."  *Sellan*, 261 F.3d at 312 (quotation

omitted).  In this regard, it is not necessary for the state court to refer explicitly to the particular

federal claim or to relevant federal case law.  *See id.*

If, however, a state court does not adjudicate a petitioner's federal claim "on the merits,"

the state court's decision is not entitled to AEDPA deference; and, instead, the federal habeas

court must apply the pre-AEDPA standard of de novo review to the state court's disposition of

the federal claim.  *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003) (quoting *Aparicio v.*

*Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)).


### 2. The admissibility of Petitioner's statements to police on August 13, 1998

Petitioner claims that the state court erred in failing to suppress his statement to the police

at the police station on August 13, 1998, in which he confessed to one of the crimes.  Petitioner

initially challenged the admissibility of his statement to the police in a pre-trial *Huntley* hearing.[9]

In that hearing, the court determined that Petitioner's statement was admissible because he was

given *Miranda* warnings before making his written statement; he knowingly, intelligently and

voluntarily waived those rights; and no pressure or coercion was used to obtain the statement.

Additionally, Petitioner claims that, on August 1, 1998, he invoked his right to counsel when the

police questioned him; and, therefore, the police violated his *Miranda* rights when they

---

[9] *People v. Huntley*, 15 N.Y.2d 72 (1965).

questioned him outside the presence of his attorney on August 13, 1998.

Once "an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981) (footnote omitted). Regarding the right to counsel and pending state charges, the Second Circuit explained that

> [t]he Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right to counsel does not attach until a prosecution is commenced, that is, at or after the initiation of adversary judicial criminal proceedings – whether by way of indictment or information. *McNeil v. Wisconsin*, 501 U.S. 171, 175, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991). Furthermore, the Sixth Amendment right "is offense specific" which means that it cannot be invoked once for all future prosecutions. *Id.*

*United States v. Mills*, 412 F.3d 325, 328 (2d Cir. 2005).

On August 1, 1998, Officer Pfohl of the Village of Chittenango Police Department removed JD from Petitioner's home after seeing her strike Petitioner. At that point, Petitioner declined to talk to the police and stated that he wanted to consult with an attorney. *See* R.[10] at 389. At that time, Petitioner was not under arrest or in custody. On August 13, 1998, after Petitioner's arrest, he was read his *Miranda* rights and agreed to speak with Investigator Rainbow. *See id.* at 230-32. During that interview, Petitioner confessed to one of the alleged crimes.

The Appellate Division found, and the record supports, that Petitioner was not in

---

[10] "R" refers to the record of the state-court proceedings filed in this matter.

"custody" when he asserted his right to counsel on August 1, 1998.  *See White*, 27 A.D.3d at 886.

In fact, he was not arrested until almost two-weeks later, at which time he received timely

*Miranda* warnings and agreed to speak with police without an attorney present.  *See id.*  As such,

Petitioner's attempt to invoke his right to counsel on August 1, 1998, had no effect on the

statements he made to police on August 13, 1998.  *See United States v. Bautista*, 145 F.3d 1140,

1149 (10th Cir. 1998) (holding that, "[i]f [the defendant] was not in custody [ ] during the

questioning, then his attempts to invoke his right to remain silent and his *Miranda* right to

counsel were ineffective"); *see also United States v. Zaleski*, 559 F. Supp. 2d 178, 190 (D. Conn.

2008) (holding that, "[b]ecause [the defendant] was not in custody when he told the officers that

he wished to speak to a lawyer, he did not invoke his *Miranda* rights, and the officers did not

violate *Edwards* when they interrogated him at the police station later in the day").  Furthermore,

Plaintiff does not contend that the police did not give him *Miranda* warning prior to making his

written statement on August 13, 1998.

Based on the foregoing, the Court finds that the state court's decision was not contrary to

nor did it involve an unreasonable application of clearly established federal law and, therefore,

denies the petition on this ground.[11]

---

[11] Even if the admission of this statement was in error because the police had violated
Petitioner's *Miranda* rights, the error was harmless because the remaining evidence
overwhelmingly supported the guilty verdict.  *See Rollins v. Leonardo*, 938 F.2d 380, 382 (2d
Cir. 1991) (applying "harmless error analysis to *Miranda*-violation confessions" (citation
omitted).

### *3. Petitioner's motion to dismiss the indictment for failing to provide sufficient specificity of the date and time of the alleged offense*

Petitioner asserts that the state court erred in denying his motion to dismiss the indictment for failing to provide sufficient specificity of the date and time of the alleged offenses and because the prosecution failed to prove that the offenses occurred during the time specified in the bill of particulars.  *See* Dkt. No. 1 at 156.  Specifically, the Appellate Division found that the indictment, as supplemented by the bill of particulars, provided sufficient specificity to permit Petitioner to prepare a defense.  *See White*, 27 A.D.3d at 885-86 (citations omitted).

"It is well settled that 'an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense.'"  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117, 94 S. Ct. 2887, 2907, 41 L. Ed. 2d 590 (1974)).  The "'indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'"  *Id.* (quotation omitted).

"Challenges to state indictments are only cognizable on habeas review if the indictment falls below basic due process requirements.  Due process requires that an indictment inform the defendant 'in general terms, of the time, place, and essential elements of the crime.'"  *Parrilla v. Goord*, No. 02 Civ. 5443, 2005 WL 1422132, *9 (S.D.N.Y. June 20, 2005) (quotation and other citation omitted).

In the present matter, the indictment specified that, "on or about the latter part of 1995," Petitioner committed the acts alleged in the indictment.  In a supplemental bill of particulars, the

-17-

time-frame was narrowed to "on or about and including October and November 1995," while the victims' mother was working at P&C.  The indictment, as narrowed by the bill of particulars, provides sufficient information to satisfy due process.  *See Rodriguez v. Hynes*, No. CV-94-2010, 1995 WL 116290, *4 (E.D.N.Y. Feb. 27, 1995) (holding that, "[c]onsidering the fact that young victims often do not remember the exact date of when an alleged offense occurred, the time spans in the indictment[, June 1, 1991 through August 25, 1991,] are not unreasonable"); *see also Valentine v. Konteh*, 395 F.3d 626, 632 (6th Cir. 2005) (holding that, "[t]his Court and numerous others have found that fairly large time windows[, in this case eleven months,] in the context of child abuse prosecutions are not in conflict with constitutional notice requirements" (collecting cases addressing time windows ranging from four months to three years)).

Based on the foregoing, the Court finds that the state court's decision was not contrary to nor did it involve an unreasonable application of clearly established federal law and, therefore, denies the petition on this ground.


### *4. Petitioner's speedy trial claim*

Petitioner asserts that the state court erred in denying his speedy trial motion which he brought pursuant to New York State Criminal Procedure Law §§ 210.20(1)(g) and 30.30.  *See* Dkt. No. 1 at 156.

Pursuant to New York State Criminal Procedure Law § 30.30, the court must grant a motion to dismiss the indictment when the prosecuting authority is not ready for trial within "six months of the commencement of a criminal action wherein a defendant" is charged with committing a felony.  N.Y. Crim. Proc. Law § 30.30.  A claim based upon a violation of section

30.30, however, does not raise a federal constitutional issue warranting federal habeas relief. *See*

*Cadilla v. Johnson*, 119 F. Supp. 2d 366, 374 (S.D.N.Y. 2000) (holding that "C.P.L. § 30.30

requires only that the prosecution be ready for trial within a prescribed time frame, and not that

the defendant be afforded a speedy trial" (citation omitted)).

Based on the foregoing, the Court finds that the state court's decision was not contrary to

nor did it involve an unreasonable application of clearly established federal law and, therefore,

denies the petition on this ground.

### 5. Petitioner's claim that the state court's evidentiary rulings deprived him of a fair trial and the right to present a defense

Petitioner asserts that the trial court's evidentiary rulings deprived him of his right to a fair

trial and of his right to present evidence. *See* Dkt. No. 1 at 156; *see also* Dkt. No. 16.   In

particular, Petitioner contends that the trial court unduly restricted his cross-examination of JD

and JS, improperly denied his request to call certain witnesses, and inappropriately limited the

testimony of other witnesses.  *See generally* Dkt. No. 16.

"In conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S.

62, 68 (1991) (citations and footnote omitted).  Thus, a habeas petitioner must demonstrate that

the allegedly erroneous state-court evidentiary rulings violated an identifiable constitutional right.

*See, e.g., Rosario v. Kuhlman*, 839 F.2d 918, 924 (2d Cir. 1988) (citations omitted); *Taylor v.

Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (holding that "[e]rroneous [state-court] evidentiary

rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance

of a writ of habeas corpus[;] [r]ather, the writ would issue *only* where petitioner can show that the error deprived her of a *fundamentally fair* trial" (citations omitted)).  This is a "heavy burden, for 'generally, rulings by state trial courts on evidentiary issues, even if erroneous, do not rise to the level of a constitutional violation.'"  *Bonet v. McGinnis*, No. 98 CIV. 6529, 2001 WL 849454, *2 (S.D.N.Y. July 27, 2001) (quotation omitted).

The first step in this analysis is to determine whether the state-court decision violated a state evidentiary rule because the proper application of a presumptively constitutional state evidentiary rule could not be unconstitutional.  *See Williams v. Walker*, No. 00-CV-5912, 2001 WL 1352105, *3 (E.D.N.Y. Oct. 31, 2001) (holding that the habeas court must first determine if ruling was erroneous under state law and, if so, whether the erroneous ruling "amounted to the denial of the constitutional right to a fair trial" (citing *Dey v. Scully*, 952 F. Supp. 957, 969 (E.D.N.Y. 1997)).  Second, the petitioner must allege that the state evidentiary error violated an identifiable constitutional right.  This necessarily eliminates consideration of purely state evidentiary errors not cognizable in the federal system.  *See, e.g., Landy v. Costello*, No. 97-2433, 141 F.3d 1151 (table), 1998 WL 105768, *1 (2d Cir. Mar. 9, 1998) (holding that, "[t]o the extent that [petitioner's] claim is based on a *Rosario* violation, it must fail, because a habeas petition can only be granted to remedy some violation of federal law; the obligation to turn over *Rosario* material arises under *state* law.  Thus, the only question is whether the prosecution violated *Brady*").

Third, an erroneous state evidentiary ruling that is asserted to be a constitutional violation will merit habeas relief only "'where [the] petitioner can show that the error deprived [him] of a *fundamentally fair* trial.'"  *Rosario*, 839 F.2d at 925 (quotation omitted); *Jones v. Stinson*, 229

-20-

F.3d 112, 119-20 (2d Cir. 2000) (citations omitted).  To determine whether the petitioner was

deprived of a fundamentally fair trial because of improperly excluded or included evidence, the

court must determine whether the evidence was "material."  *United States v. Agurs*, 427 U.S. 97,

112-13 (1976).

> The proper standard of materiality must reflect our overriding
> concern with the justice of the finding of guilt. . . . Such a finding
> is permissible only if supported by evidence establishing guilt
> beyond a reasonable doubt.  It necessarily follows that if the
> omitted evidence creates a reasonable doubt that did not otherwise
> exist, constitutional error has been committed.  This means that the
> omission must be evaluated in the context of the entire record. . . .
> If there is no reasonable doubt about guilt whether or not the
> additional [evidence] is considered, there is no justification for a
> new trial.  On the other hand, if the verdict is already of
> questionable validity, additional evidence of relatively minor
> importance might be sufficient to create a reasonable doubt.

*Id.* (internal footnotes omitted).  This "fundamental fairness" standard applies to both the

erroneous exclusion and admission of evidence. *See, e.g., Dowling v. United States*, 493 U.S.

342, 352 (1990) (applying the fundamental fairness standard to the alleged erroneous

introduction of evidence); *Agurs*, 427 U.S. at 112-13 (applying the fundamental fairness standard

to the alleged erroneous omission of evidence).

The final question is how to apply the AEDPA in the context of a fundamental fairness

analysis; an issue that the Second Circuit addressed in *Jones v. Stinson*, 229 F.3d 112 (2d Cir.

2000).  In *Jones*, the state appellate court decided that the trial court's evidentiary rulings had not

denied the defendant a fair trial.  *See id.* at 116.  The Second Circuit held that, although it might

have found, under the *Agurs* standard, that one of the trial court's rulings "create[d] a reasonable

doubt which did not otherwise exist," *see id.* at 114, the Second Circuit could not conclude that

the excluded testimony "would so certainly have created new ground for reasonable doubt that the appellate division's decision [affirming the trial court's ruling] was objectively unreasonable." *Id.* at 120.  As such, the Second Circuit denied habeas relief based on the AEDPA's deferential standard of review.  *See id.* at 120-21.

### a. The trial court did not unduly restrict Petitioner's cross-examination of witnesses

Petitioner argues that the trial court erroneously denied him the right to cross-examine JD and JS about how JS had repeatedly made false complaints about people with whom he was living and how JD had destroyed Petitioner's home, which would have established JD's hostility towards him.  *See* Dkt. No. 16 at 19.  To establish this hostility, Petitioner sought to introduce photographs of his house to show the damage that JD had caused.

Although a defendant's Sixth Amendment right to confront witnesses is guaranteed in both federal and state criminal proceedings, the right to cross-examination is not absolute.  *See Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (citations omitted).  "[T]he right to confront and cross examine witnesses is tempered by a trial judge's 'wide latitude' to impose 'reasonable limits' in order to avoid matters that are confusing or of marginal relevance." *United States v. Stewart*, 433 F.3d 273, 311 (2d Cir. 2006) (quotation omitted).  Moreover, the trial court may limit cross-examination "'based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.'" *Young v. McGinnis*, 411 F. Supp. 2d 278, 302 (E.D.N.Y. 2006) (quotation and other citations omitted).

"Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective

cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (citation omitted).  A court does not improperly curtail cross-examination if "the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990) (citation omitted); *see also Howard v. Walker*, 406 F.3d 114, 129 (2d Cir. 2005) (quotation omitted).

At trial and on appeal, Petitioner argued that JD began fabricating the story of Petitioner's sexual abuse as a means to avoid further action on JD's arrests during the summer of 1998.  *See* Dkt. No. 1 at 63.  Further, Petitioner alleged that JD's hostility towards him led JD to fabricate the alleged sexual abuse.  *See id.*

The trial court excluded the photographs of Petitioner's house as collateral but allowed Petitioner to use them to refresh JD's recollection, if necessary.  *See* Dkt. No. 1 at 64-65.  The trial court properly excluded these pictures.  JD testified extensively that she and her friends spray-painted interior walls of Petitioner's house, poked a hole in the wall, threw an axe through a wall or door, and threw garbage in the basement.  *See* R. at 1273-85, 1338.  Moreover, JD testified that, during the course of her stay at Petitioner's home, she permitted her friends to take what they wanted from his home and that they, in fact, removed numerous items, including Petitioner's washer and dryer, futon, and wedding ring.  *See id.* at 1275-77.  Although JD testified that she did not cause all of the damage to Petitioner's home, she admitted that it was her fault because she was living there and allowed it to happen.  *See id.* at 1337.  Finally, JD admitted that she did not like Petitioner and that she had cursed him and called him offensive names.  *See id.* at 1338-39.

Considering that JD admitted to disliking Petitioner and that she caused extensive damage to his home, the photographs were unnecessary to establish her bias and hostility; and, therefore, the trial court properly excluded them.  Even if the trial court improperly excluded the pictures, the error was harmless in light of the overwhelming evidence establishing Petitioner's guilt, including the signed admission.

Moreover, with respect to JS, Petitioner's counsel attempted to cross-examine him about a variety of problems he had with a number of people with whom he had lived.  *See* Dkt. No. 1 at 67.  The trial court sustained the prosecutor's objections on the ground that the questions pertained to matters that were "all collateral."  *See* Exhibit D at 1564-68.  Petitioner was, however, permitted to examine JS about whether he had any animus towards him.  *See id.* at 1570-73, 1575.

Again, Petitioner failed to establish that the trial court improperly excluded the testimony.  It is unclear how JS's past behavioral issues towards other people were in any way relevant to Petitioner's case.  Any bias JS may have had was thoroughly established through the questions regarding his animus towards Petitioner.  Finally, even if it was error to preclude these questions, the error was harmless in light of the overwhelming evidence establishing Petitioner's guilt.

### b. The trial court did not prevent Petitioner from presenting a defense when it precluded or limited testimony concerning irrelevant and collateral matters

Petitioner asserts that, on a number of occasions, he attempted to call witnesses who would have provided facts tending to show the complainants' motivation to lie, inconsistent statements, multiple recantations of the allegations, and an inability of the prosecution's witnesses to state a month or year in which the incidents allegedly occurred.  *See* Dkt. No. 1 at

70.  Specifically, Petitioner made offers of proof as to Cheryl Darrow, an employee of the

Madison County Department of Social Services ("DSS"), Officer Costello, Officer Ann Baum,

the complainants' older sister MS, and Police Chief Paul.  *See id.*  Petitioner claims that the trial

court improperly precluded him from calling Ms. Darrow, Officer Costello and Chief Paul as

witnesses, and improperly limited the other witnesses' testimony.  *See id.*

"The right to a fair trial, guaranteed to state criminal defendants by the Due Process

Clause of the Fourteenth Amendment, imposes on States certain duties consistent with their

sovereign obligation to ensure 'that '"justice shall be done"' in all criminal prosecutions."  *Cone v.

Bell*, 129 S. Ct. 1769, 1772 (2009) (quotation omitted).  Although "[t]he Constitution guarantees

a fair trial through the Due Process Clauses, . . . it defines the basic elements of a fair trial largely

through the several provisions of the Sixth Amendment," including the Confrontation Clause.

*United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006) (quoting *Strickland* [*v. Washington*,

466 U.S. 668,] 684-685, 104 S. Ct. 2052, [80 L. Ed. 2d 674 (1984)]).  A criminal defendant's

right to confront and cross-examine adverse witnesses "helps assure the 'accuracy of the

truth-determining process.'"  *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (quotation and

other citation omitted).  "The rights to confront and cross-examine witnesses and to call

witnesses in one's own behalf have long been recognized as essential to due process."  *Id.* at 294.

### i. Cheryl Darrow

Petitioner's counsel stated that he wanted to call Ms. Darrow to establish four things: (1)

that Ms. Darrow was present when Officer Rainbow interviewed JD on August 10, 1998, and

that Ms. Darrow recorded in her notes that JD said that she was ten-years old when the incident

occurred; (2) that, on September 4, 1998, when Ms. Darrow arrived to speak with JD, she

observed JD putting Petitioner's clothes and suitcases in the driveway and that JD then informed

Ms. Darrow that the Chittenango Police were "on her side;" (3) Investigator Rainbow or other

members of the Chittenango Police made Ms. Darrow "aware on four different occasions" that

JD was frequently intoxicated in her home between August and October of 1998; and (4) that it

was not DSS or Child Protective Services' decision to have JD stay at home. *See* R. at 1803-06.

Regarding the second basis, the prosecutor noted that, if JD was confronted regarding

why she put Petitioner's belongings in the driveway, she would simply state that Petitioner

wanted his belongings. *See id.* at 1811.  With regard to the third basis, the trial court sustained

the prosecutor's objection on the ground that it was irrelevant and that it was extrinsic evidence

being introduced to discredit both Officer Rainbow and JD. *See id.* at 1808-09.  Regarding the

fourth basis, the trial court found that the issue was collateral and irrelevant and sustained the

prosecution's objection. *See id.* at 1807.

With regard to the first basis, the prosecutor alerted the state court and counsel of his

concern that, if Ms. Darrow testified that JD said that she was ten-years old during the Truth or

Dare game, in order to have a full and fair opportunity to cross-examine Ms. Darrow, the

prosecutor might have to elicit information pertaining to other acts that Petitioner committed that

JD discussed when she was interviewed. *See id.* at 1812.  The trial court then permitted Ms.

Darrow to testify outside the presence of the jury so that Petitioner's counsel could decide

whether to call her. *See id.* at 1813.

Outside the presence of the jury, Ms. Darrow testified that, when the police interviewed

JD on August 10, 1998, she said that she was ten-years old when she played Truth or Dare with

her siblings and Petitioner.  *See id.* at 1815.  During cross-examination, however, Ms. Darrow

conceded that her notes reflecting that JD was ten "[might] not, in fact, be accurate."  *See id.* at

1816-27.  The prosecutor also asked her whether, during her interviews with JD, "various

occasions [were] elicited . . . at various ages where she alleged differing types of sexual conduct

by the defendant towards her," to which Ms. Darrow replied "correct."  *See id.* at 1825.

Following Ms. Darrow's proffer, the trial court ruled that the prosecutor could ask Ms. Darrow

the types of questions he had just asked if Petitioner questioned her about the entry in her notes

discussing JD's age at the time of the alleged incident.  *See id.* at 1831.

     The trial court properly determined that Ms. Darrow could testify regarding these other

alleged acts.  Petitioner was attempting to discredit JD by introducing evidence that she provided

different dates for when the alleged sexual misconduct occurred.  The fact that similar conduct

occurred on several different occasions, in addition to JD's young age, would have properly

rehabilitated JD's testimony after Petitioner attempted to impeach it with this extrinsic evidence.

Although the trial court provided Petitioner with the option to examine Ms. Darrow, it would

have been well within its authority to preclude the testimony entirely.  *See People v. Brown*, 24

A.D.3d 884, 887-88 (3d Dep't 2005) (holding that the trial court properly excluded the testimony

of the victim's former boyfriend because the defendant sought to introduce this testimony solely

to attack the victim's credibility (citations omitted)).

     Based on the foregoing, the Court finds that the trial court properly ruled on the

admissibility of Ms. Darrow's testimony.  Moreover, even if the court's decision was in error, the

error was harmless because, even if Petitioner introduced Ms. Darrow's testimony to discredit JD,

the remaining evidence overwhelmingly established Petitioner's guilt.  Further, JD's age at the

time of the incident, as well the approximate date on which the incident occurred, was thoroughly established by credible testimony throughout the trial.

### ii. Officer Costello

Petitioner also alleges that the trial court erred in precluding Officer Costello from testifying. *See* Dkt. No. 1 at 77-78. At trial, Petitioner argued that he wished to call Officer Costello to establish that (1) he took a complaint report on September 11, 1998, from Petitioner reporting damage and missing items from his home and that JD was involved; (2) Officer Rainbow found out about the complaint; and (3) JD benefitted by making accusations against Petitioner in that she was not arrested for her own misconduct. *See* R. at 1833-35. Petitioner's counsel explained that it was Petitioner's theory that JD was engaging in criminal acts and not getting arrested and that she was "us[ing] her status as a victim in order to get out of criminal trouble." *See id.* at 1835. The trial court found that these were "collateral matters" and that, if there was a relevancy objection, the court would have sustained the objection. *See id.* at 1835-36. As such, the court precluded Petitioner from pursuing this line of questioning. *See id.* at 1837.

Again, the court properly precluded this information as extrinsic evidence of collateral matters, introduced solely to impeach JD. *See Brown*, 24 A.D.3d at 887-88 (citations omitted).

### iii. Officer Baum

Petitioner also alleges that the trial court improperly ruled that he could not call Officer Baum to testify. *See* Dkt. No. 1 at 78-80. Petitioner argued that he wanted to call Officer Baum

to establish that, (1) on August 10, 1998, when Officer Baum was interviewing SD, JD came in

and out of the room and tried to tell SD the "dates when this occurred because [SD] didn't

remember;" (2) after Petitioner's arrest, Officer Baum was called to JD's home for noise and

underage drinking complaints, and that she referred the complaints back to Investigator Rainbow;

(3) when Officer Baum responded to one of the complaints, JD began yelling at her and said that

she should "fuck off" because JD was a juvenile and there was nothing that Officer Baum could

do; (4) Officer Baum was involved in an investigation where a gun was retrieved from Pam Hart

and that JD was found to have provided the gun; and (5) JD told Officer Baum that she hated her

grandparents because they were "rich." *See* R. at 1838-40.

The prosecutor had no objection to Petitioner inquiring about JD being present when SD

was being interviewed. *See id.* at 1844. However, the prosecutor argued that the other testimony

discussed collateral matters and was irrelevant. *See id.* at 1845-46. The trial court allowed

questions concerning JD entering the room when SD was being interviewed but held that, as to

the other lines of questioning, if the prosecutor objected, the court would sustain those

objections. *See id.* at 1848.

Again, the trial court properly limited Officer Baum's testimony. The offer of proof

makes clear that Petitioner wished to question Officer Baum regarding collateral and irrelevant

matters and that he was seeking to introduce prior bad acts to impeach JD. *See Brown*, 24

A.D.3d at 887-88 (citations omitted).

### iv. MS

Petitioner asserts that the trial court improperly limited MS's testimony. *See* Dkt. No. 1 at

80-84.  Petitioner argues that he was prepared to call MS, JD's older sister, to testify that, in 1996, prior to making the allegations against Petitioner, JD made similar allegations against MS's boyfriend, Bob Peck.  *See id.* at 80 (citing R. 1852).  Specifically, Petitioner claims that MS was prepared to testify that JD lived with her in 1996 for approximately four months and that JD's conduct while living there was such that MS was forced to throw her out of the house.  *See id.* at 81.  Petitioner claims that MS would have testified that, upon being thrown out of the house, JD alleged that MS's boyfriend had raped her.  *See id.* (citation omitted).

Petitioner alleges that, during her testimony, JD denied that MS asked her to leave her house; denied that there was any problem; denied fighting with MS; and testified that she left because of an argument that had ensued between MS and Mr. Peck when Mr. Peck touched her and asked her "to do sexual things."  *See id.* at 81.  Moreover, Petitioner asserts that JD claimed to have confronted Mr. Peck and that she was not asked to leave and did not leave MS's house. *See id.*

At trial, MS testified that JD's younger siblings told her that JD lied about Petitioner raping her.  *See* R. at 1877.  Specifically, MS testified that JD's younger siblings told her that Petitioner never penetrated JD.  *See id.* at 1883-84.  The court, however, did not allow Petitioner's counsel to ask MS about whether JD accused Mr. Peck of rape or whether JD was thrown out of her house.  JD was asked during cross-examination whether she ever made this allegedly false allegation and denied that she had.

"Questioning concerning prior false allegations of rape or sexual abuse is not always precluded . . . , and the determination whether to allow such questioning 'rests within the discretion of the trial court[.] . . .'"  *People v. Bridgeland*, 19 A.D.3d 1122, 1123 (4th Dep't 2005)

(internal citations and quotation omitted).  To be admissible, the defendant must demonstrate that "'the particulars of the complaints, the circumstances or manner of the alleged assaults or the currency of the complaints were such as to suggest a pattern casting substantial doubt on the validity of the charges made by the [complainant] [.]'"  *Id.* at 1124 (quotation omitted).

In the present matter, Petitioner failed to establish that the particulars of the alleged false complaint against Mr. Peck and the circumstances of Petitioner's alleged sexual assaults were sufficiently similar to suggest that there was substantial doubt about the truthfulness of JD's charges.  *See id.*  JD's allegedly false allegations against Mr. Peck appear to be no more than a passing comment, which did not lead to any criminal action being taken.  Petitioner did not allege in his proffer that criminal charges were ever filed against Mr. Peck or that this allegation was more than a single, isolated incident.  Moreover, Petitioner was allowed to question JD regarding this alleged instance.  Although JD's younger siblings allegedly told MS that Petitioner had not penetrated JD, MS implied that they did not suggest or state that none of the alleged sexual contact occurred.

Based on the foregoing, the Court denies Petitioner's motion on this ground.  Petitioner failed to establish that the alleged false complaint against Mr. Peck was in any way similar to present situation.

### *v. Police Chief Paul*

Petitioner asserts that the trial court erred in precluding testimony from Police Chief Paul to establish that, since September 1998, Chief Paul and Officer Rainbow had refused to meet with Petitioner or take any complaints concerning the destruction of his home that JD has caused.

*See* Dkt. No. 1 at 84 (citing R. 1858-59).  Petitioner claims that this testimony would have

established that the Chittenango Police were giving JD preferential treatment and that this

testimony was relevant "to issues of credibility and bias, and Officer Rainbow's hostility toward

[Petitioner]."  *See id.* at 1.

Again, the state court properly precluded this testimony as extrinsic evidence on a

collateral matter solely to impeach JD's and Officer Rainbow's credibility.  *See* R. at 1858; *see*

*also Brown*, 24 A.D.3d at 887-88 (citations omitted).[12]

### 6. The trial court's refusal to instruct the jury pursuant to CPL § 710.70

Petitioner asserts that, both before and during trial, he challenged the voluntariness of his

statements to Officer Rainbow upon arrest.  *See* Dkt. No. 1 at 85-87.  Specifically, Petitioner

claims that, during trial, his counsel

> brought out facts showing that four police officers surrounded and
> arrested [Petitioner] at his home (R. 1654); that [Petitioner] was
> handcuffed and brought to the police station in a police car (R.
> 1654); that [Petitioner] was placed in the officer's office at the
> police station and was not free to leave (R. 1655); that [Petitioner]
> appeared "startled" (R. 1655); that Officer Rainbow showed
> [Petitioner] statements made by his step-children making the
> allegations against him (R. 1656); and that Officer Rainbow did
> not tape record or attempt to tape record the interrogation even
> though the necessary equipment was available (R. 1656-1658); that
> [Petitioner] was crying when the officer turned the lights off in the
> interrogation room (R. 1693-1694); that the officer told [Petitioner]
> that he had all kinds of evidence against him in an effort to get him
> to confess, and that [Petitioner] was sobbing at that point (R.

---

[12] Even if the Court were to find error with any of these evidentiary rulings, the Court
would still deny the petition because it is clear beyond a reasonable doubt that Petitioner would
have been convicted even if the trial court had admitted the disputed evidence.  *See Benn v.
Greiner*, 402 F.3d 100, 105-06 (2d Cir. 2005).

> 1663); that Officer Rainbow did not give [Petitioner] the
> opportunity to write his own statement (R. 1670); that Officer
> Rainbow told the [Petitioner] that he didn't believe him and called
> [Petitioner] a liar when he denied the allegations against him (R.
> 1667; 1689); and that Officer Rainbow turned off the lights in his
> office during the interrogation before [Petitioner] gave any
> statements claiming that it was to make [Petitioner] more
> comfortable (R. 1690-1694); and that [Petitioner] did not give the
> officer a statement until the lights had been turned back on (R.
> 1689-1695).

*See id.* at 86-87.  Petitioner argues that, among other things, in light of this testimony, the trial

court erred in failing to give a jury charge concerning the voluntariness of his confession

pursuant to Criminal Procedure Law §§ 60.45 and 710.70.  *See id.* at 88.

    In his habeas petition, Petitioner claims that the trial court's refusal to deliver a

voluntariness charge to the jury violated his due process rights.  To support this claim, Petitioner

cites, among other things, New York Criminal Procedure Law § 710.70(3), which requires the

court to submit the voluntariness issue to the jury.  *See* N.Y. Crim. Proc. Law § 710.70(3).  The

question of whether the trial court acted in accordance with New York state law when it refused

to issue voluntariness instructions to the jury, however, is beyond the purview of this Court in

deciding whether to issue a writ of habeas corpus.  *See Estelle*, 502 U.S. at 67-68 (holding that "it

is not the province of a federal habeas court to reexamine state-court determinations on state-law

questions").  Rather, the Court must determine whether the failure to provide a voluntariness

instruction to the jury amounts to a violation of Petitioner's constitutional rights.

    In *Lego v. Twomey*, 404 U.S. 477 (1972), the Supreme Court explicitly rejected a state

petitioner's "contention that, even though the trial judge ruled on his coercion claim, he was

entitled to have the jury decide the claim anew."  *Id.* at 489.  The Court held that the Constitution

does not require "submission of voluntariness claims to a jury as well as a judge." *Id.*  Instead,

the Constitution protects a defendant's right to have the judge, not a jury, determine the

voluntariness of statements.  *See id.* at 483.  "Although in New York state courts a defendant is

entitled to a voluntariness charge, *see* N.Y. C.P.L. 710.70(3); *People v. Cefaro*, 23 N.Y.2d 283,

296 N.Y.S.2d 345, 244 N.E.2d 42 (1968), there is no analogous requirement under the United

States Constitution."  *Zapata v. Greene*, No. 03-CV-5730, 2005 WL 1521186, *13  (E.D.N.Y.

June 27, 2005) (citations omitted).

Accordingly, the Court finds that the state court's decision not to give a jury instruction

regarding the voluntariness of the Petitioner's statements is neither contrary to nor an

unreasonable application of any clearly established federal law.


### 7. The trial court's refusal to instruct the jury as to prompt outcry[13]

Petitioner asserts that "[t]he trial court erred in refusing to instruct the jury that it could

consider the complainants' delay in reporting the alleged sexual abuse because prompt outcry, or

lack thereof, on the part of a complainant may be relevant in determining the complainants'

credibility."  *See* Dkt. No. 1 at 100 (citations omitted).  Respondent claims that Petitioner did not

exhaust this claim and that the claim is procedurally barred and otherwise meritless.  *See* Dkt.

No. 12 at 44-47.

---

[13] Respondent asserts that Petitioner did not fully exhaust this claim because "[P]etitioner did not present this claim. . . in constitutional terms in state court."  *See* Dkt. No. 12 at 44-45. However, "[t]here is no need to resolve this question because the law is clear that a habeas court may deny a claim on the merits despite a petitioner's failure to exhaust it fully before the state courts."  *Lucas v. Conway*, No. 08 Civ. 8405, 2009 WL 2525489, *5 (S.D.N.Y. July 16, 2009) (citing 28 U.S.C. § 2254(b)(2); *Rhines v. Weber*, 544 U.S. 269, 277 (2005)).

In *People v. Bessette*, 169 A.D.2d 876 (3d Dep't 1991), the defendant was convicted of sodomy in the first degree and sexual abuse in the first degree. *See id.* at 876. The defendant argued that the trial court erred in refusing to instruct the jury that the victim's delay in disclosing the alleged offense should be considered when assessing the victim's credibility. *See id.* at 877 (citations omitted). Disagreeing with the defendant, the court held that "the patterns of response among rape victims are not within the ordinary understanding of the lay jury." *Id.* at 878 (citation omitted). Moreover, the court noted that, in light of defense counsel's comments during summation and the prosecutor's in response, the court's comprehensive witness credibility charge was sufficient to inform the jury of the governing principle. *See id.* (citation omitted). The court also noted that the defendant was in a "*loco parentis*" relationship with the victim and threatened him if he disclosed what had happened. *See id.*

In the present matter, the court instructed the jury that,

> [i]n deciding the credibility; that is the believability of any particular witness, you may use the same tests used in your everyday affairs to determine the reliability or unreliability of statements made to you by others.
>
> Among the facts to be [taken] into account in evaluating and assessing the testimony of the witnesses are the interest or lack of interest of the witness that they may have in the outcome of this case; any bias or prejudice that a witness may have; the age; the appearance; and the manner in which the witness has testified; the opportunity that the witness has had to observe the facts testified to . . .
>
> The credibility; that is, the believability, of each witness is itself an issue of fact solely and exclusively within the province of the jury. With respect to each witness, you must determine to what extent you find the witness's testimony credible and acceptable. With respect to any individual witness, you may accept in whole or in part such testimony you find credible and worthy of belief or

> reject in whole or in part such testimony you find unworthy of
> credit or belief.

*See* R. at 1998-99.

Moreover, Petitioner's counsel specifically addressed JD's credibility, as well as the

credibility of the other witnesses, and discussed why the jury should discredit their testimony.

*See id.* at 1946-58.  Petitioner's counsel also spent a significant amount of time discussing the

complainants' motives for fabricating the offenses and various other reasons why the jury should

not believe their allegations.  *See id.*

Considering the jury instructions and Petitioner's counsel's arguments during summation,

the Court finds that the trial court did not err in declining to instruct the jury regarding the

complainants' delay in disclosing the offense.  *See Bessette*, 169 A.D.2d at 878 (citation

omitted).[14]

### 8. The weight of the evidence and the sufficiency of the evidence

Petitioner asserts that the jury's verdict was against the weight of the evidence and that the

evidence was insufficient to establish his guilt.  *See* Dkt. No. 1 at 101-09.[15]

Review of a conviction as against the "weight of the evidence" is a product of New York

state statute and, therefore, merely a state-law issue.  *See* N.Y. Crim. Proc. Law § 470.15; *Ward*

---

[14] The Court notes that it is unclear what federal constitutional right this alleged error
implicates.

[15] As to complainant JD, the jury convicted Petitioner of Rape in the First Degree (New
York Penal Law § 130.35), Rape in the Second Degree (New York Penal Law § 130.30),
Sodomy in the First Degree (New York Penal Law § 130.50), and Sodomy in the Second Degree
(New York Penal Law § 130.45).  As to complainant SD, the jury convicted Petitioner of two
counts of Sodomy in the First Degree.

*v. Herbert*, 509 F. Supp. 2d 253, 264 & n.3 (W.D.N.Y. 2007) (citations omitted).  Since federal habeas corpus review is not available to remedy mere errors of state law, *see Estelle*, 502 U.S. at 67-69, no cognizable federal issue is presented by a habeas claim challenging the weight of the evidence adduced at trial, *see Ward*, 509 F. Supp. 2d at 264 & n.3 (citations omitted).  A challenge to the sufficiency of the evidence, however, is amenable to federal habeas review.  *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)).

To analyze the sufficiency of the evidence of a state conviction, "'[a] federal court must look to state law to determine the elements of the crime.'"  *Id.* (quotation omitted).  A habeas petition based on the evidentiary sufficiency of a state-court conviction fails if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This standard places a "'heavy burden'" on a habeas petitioner.  *See United States v. Parkes*, 497 F.3d 220, 225 (2d Cir. 2007) (quotation and other citations omitted).

To convict a defendant of rape in the first degree, as charged, the prosecution must prove that the defendant engaged in sexual intercourse with the victim by forcible compulsion.  *See* N.Y. Penal Law § 130.35(1).[16]  In order to convict a person of rape in the second degree, the prosecution must establish that a person, "being eighteen years old or more, . . . engage[d] in sexual intercourse with another person less than fifteen years old[.]"  N.Y. Penal Law § 130.30(1).

---

[16] The Court has used the language contained in the relevant New York Penal Law section from the time of Petitioner's conviction.  Although the title of the offenses and statutory language were amended, the elements for each of Petitioner's offenses has remained the same.

A person is guilty of sodomy in the first degree when he "engages in deviate sexual intercourse with another person [either] (1) By forcible compulsion; or . . . (3) Who is less than eleven years old" N.Y. Penal Law § 130.50.[17]   A defendant is guilty of sodomy in the second degree if the defendant was older than eighteen-years old and engaged in deviate sexual intercourse with another person less than fifteen-years old.  *See* N.Y. Penal Law § 130.45 (1965).

Deviate sexual intercourse is defined, in relevant part, as "sexual conduct between persons not married to each other consisting of contact between . . . the mouth and penis." N.Y. Penal Law § 130.00(2) (1965).  "Forcible compulsion" is defined, in part, as compelling another "by either . . . use of physical force; or . . . a threat, express or implied, which places a person in fear of immediate death or physical injury to himself, herself or another person[.]"  *See* N.Y. Penal Law § 130.00(8).  Finally, "sexual intercourse" "has its ordinary meaning and occurs upon any penetration, however slight."  N.Y. Penal Law § 130.00(1).

In the present matter, the testimony of AW, JD, and SD established that JD and SD were born on July 1, 1982, and January 13, 1985, respectively, *see* R. at 1119, 1174, 1414-15; and Officer Rainbow's testimony established that Petitioner's date of birth was September 29, 1956, *see id.* at 1641.  Officer Rainbow's testimony also established that AW was married to Petitioner. *See id.* at 1753.  Moreover, the testimony of AW, JD, and SD established that, while AW was at work, in 1995, JD, SD and JS played Spin the Bottle and Truth or Dare with Petitioner.  *See id.* at 1125-28, 1130-31, 1490.  During these games, the testimony established that both JD and SD

---

[17] This is the language of the statute under which Petitioner was convicted, prior to the October 19, 2000 amendment.  *See* McKinney's 2000 Session Law News of N.Y. Ch. 1, § 37 (L. 2000, c. 1, § 37, eff. Feb. 1, 2001).  As amended, the statute is now entitled "criminal sexual act in the first degree."

engaged in oral sexual conduct with Petitioner and that Petitioner had sexual intercourse with JD. *See id.* at 1133, 1137-38, 1424, 1432, 1495.  Moreover, regarding the forcible compulsion element, the children's testimony established that they were scared of Petitioner because in the past he had choked, hit and/or slapped them and that they did what they were told to do in Petitioner's home or they "got the worst of it."  *See id.* at 1134-35, 1426, 1429.  Finally, although the children's testimony provided sufficient evidence of Petitioner's guilt of the charged crimes, Petitioner also signed a written confession, admitting that he had engaged in conduct constituting sodomy with JD.  *See id.* at 1633, 1638.

Based on the foregoing, Petitioner has failed to establish that no rational trier of fact could have found that he engaged in conduct establishing the elements of each of the crimes of which he was convicted beyond a reasonable doubt.  As such, the Court finds that Petitioner has failed to establish that there was insufficient evidence to support his convictions.

### 9. Petitioner's sentence

Petitioner contends that his sentence was excessive and harsh.

For Petitioner's conviction for Rape in the First Degree under count one of the indictment, the court imposed an indeterminate prison sentence of twelve and one-half to twenty-five years. For his conviction for Rape in the Second Degree under count two of the indictment, the court imposed an indeterminate prison sentence of two-to-six years.  For Petitioner's conviction for Sodomy in the First Degree under count three of the indictment, the court imposed an indeterminate prison sentence of twelve and one-half to twenty-five years.  For Petitioner's conviction for Sodomy in the Second Degree under count four of the indictment, the court

imposed an indeterminate prison sentence of two to six years.  For Petitioner's conviction for Sodomy in the First Degree under count five of the indictment, the court imposed an indeterminate prison sentence of twelve and one-half to twenty-five years.  Finally, for Petitioner's conviction for Sodomy in the First Degree under count six of the indictment, the court imposed an indeterminate prison sentence of twelve and one-half to twenty-five years. Counts one through four concerned victim JD, and counts five through six concerned victim SD. The court directed that the sentences it was imposing on counts one through four run concurrently with each other and that the sentences it was imposing on counts five through six run concurrently with each other but consecutively to the sentence it was imposing on counts one through four.  *See* N.Y. Penal Law § 70.25 (authorizing consecutive terms of imprisonment).

At the time that Petitioner was convicted, the crimes of Rape in the First Degree and Sodomy in the First Degree were classified as B Violent Felonies.  *See* N.Y. Penal Law §§ 130.35, 130.50.  Moreover, Rape in the Second Degree and Sodomy in the Second Degree were classified as D Violent Felonies.  *See* N.Y. Penal Law §§ 130.30, 130.45.  For Petitioner's B Violent Felony convictions, the court was authorized to impose an indeterminate prison sentence, the maximum term of which was required to be at least six years, but not to exceed 25 years.  *See* N.Y. Penal Law § 70.20(2).  Further, the minimum period of imprisonment under an indeterminate sentence for a B Violent Felony was required to be one-half the maximum term imposed.  *See id.*  With respect to Petitioner's D Violent Felony convictions, the court was authorized to impose an indeterminate prison sentence, the maximum term of which was required to be at least three years, but not to exceed seven years.  *See* N.Y. Penal Law § 70.00(3)(b).  Finally, the court was authorized to order Petitioner's sentences for the counts

relating to JD to run consecutively to Petitioner's sentences for the counts relating to SD because the counts represented separate and distinct acts, impacting different victims. *See* N.Y. Penal Law § 70.25; *see also People v. Perkins*, 27 A.D.3d 890, 894 (3d Dep't 2006).   As such, Petitioner's sentences fell within the permissible statutory range provided for under New York State Law.

It is well-established that no federal constitutional issue exists where the sentence a state court imposes is within the range that state law prescribes. *See, e.g., White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (citation omitted).  Furthermore, to the extent that Petitioner is raising an Eighth Amendment challenge to this sentence, *see* Dkt. No. 1 at 111-12, "[a] sentence of imprisonment which is within the limits of a valid state statute is simply not cruel and unusual punishment in the constitutional sense," *Scheckells v. Cunningham*, No. 9:03-CV-1219, 2007 WL 1428472, *12 (N.D.N.Y. May 11, 2007) (citation omitted).

Based on the foregoing, the Court denies the petition on this ground.


**C.     Certificate of appealability**

A court may only issue a Certificate of Appealability "if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Since Petitioner has failed to make such a showing, the Court declines to issue a Certificate of Appealability in this matter.  *See Hohn v. United States*, 524 U.S. 236, 239-40 (1998).


**IV. CONCLUSION**

After carefully reviewing the entire record in this matter, Magistrate Judge Lowe's

Report-Recommendation & Order, Petitioner's objections, and the applicable law, and for the

reasons stated in Magistrate Judge Lowe's Report-Recommendation & Order as well as in this

Memorandum-Decision and Order, the Court hereby

**ORDERS** that Magistrate Judge Lowe's January 18, 2011 Report-Recommendation &

Order is **ACCEPTED in its entirety**; and the Court further

**ORDERS** that Petitioner's petition for a writ of habeas corpus is **DENIED** and

**DISMISSED**; and the Court further

**ORDERS** that no Certificate of Appealability shall be issued with respect to any of

Petitioner's claims.

**IT IS SO ORDERED.**

Dated: March 31, 2011
          Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge